## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## EASTERN DIVISION

| | |
|---|---|
| STEVEN M. AULA, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ARC AUTOMOTIVE, INC., TOYODA GOSEI NORTH AMERICA, INC., and GENERAL MOTORS, LLC,<br><br>Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>JURY TRIAL DEMANDED |

## I.     NATURE OF THE ACTION

1.     This action concerns a critical safety defect that endangers the lives of hundreds of thousands of Michigan residents.

2.     Specifically, ARC Automotive, Inc. ("ARC") designed and manufactured defective toroidal stored gas hybrid airbag inflators that can rupture and shoot metal shrapnel (the "Inflator Defect"), which in turn can kill the driver and passenger. ARC supplied its Defective Inflators to Toyoda Gosei North America, Inc. ("Toyoda Gosei"), which in turn assembled those inflators into airbag modules and then supplied those modules to General Motors, LLC ("GM") which placed those airbags containing the Defective Inflators into 2010-2017 Chevrolet Equinox

models and marketed, distributed, and sold those vehicles throughout the state (the "Class Vehicles").

3.      The Inflator Defect is uniformly present in all of the Class Vehicles' airbags because it is the result of fundamental flaws in the way the inflators are designed.

4.      First, ARC chose to use phase-stabilized ammonium nitrate ("PSAN") in the airbag propellant. PSAN is extremely volatile. When pressure unexpectedly rises within the inflator, PSAN exponentially increases its burn rate, and in doing so exerts extreme pressure on the metal inflator cannister.

5.      ARC then made the problem worse by specifying the use of a deficient friction welding process that allows for softened metal to splash outside of the welding area, known as "flash." During deployment, flash on the inside of the canister can then fully or partially block the exhaust port, creating excess pressure within the system—which, in turn, is magnified by PSAN's extreme volatility.

6.       ARC further chose to not incorporate alternative designs that would mitigate over-pressurization, including pressure relief valves.

7.      The Class Vehicles are equipped with airbag modules containing ARC's toroidal stored gas hybrid inflators, all of which suffer from the Inflator Defect (the "Defective Inflators").

8. The Inflator Defect poses a severe risk of harm to Plaintiff and the Class. Indeed, several of ARC's Defective Inflators have ruptured in the field and in testing, causing at least two deaths as well as severe permanent physical injuries.

9. Plaintiff and the Class members had no means of knowing about the Inflator Defect prior to purchasing their Class Vehicles given that the Defendants had exclusive knowledge of the particular airbag inflators equipped in the vehicles. Defendants, in turn, knew of the Inflator Defect but concealed, rather than disclosed, its existence.

10. The safety of the Class Vehicles was a material term of the transaction. The Inflator Defect renders those vehicles unsafe and, consequently, would have been a material fact of the transaction to an ordinary reasonable consumer.

11. Plaintiff and the Class members suffered economic injury by purchasing and leasing Class Vehicles when they would not have done so, or paying more to do so than they otherwise would have, had the Inflator Defect been disclosed. And, most critically, they are exposed to the risk of severe and even fatal injury each time they drive their vehicles.

12. Through this action, Plaintiff seeks to obtain financial damages for the economic injury they and the Class have sustained, as well as injunctive and declaratory relief to ensure the Class Vehicles are made safe and the Defendants are forced to cease their deceptive and unfair business practices.

## II.   PARTIES, JURISDICTION, AND VENUE

13.   Plaintiff Steven Aula purchased a 2010 Chevrolet Equinox in Michigan. Plaintiff would not have paid the amount he paid to purchase the vehicle had the Inflator Defect been disclosed. As a result, Plaintiff was denied the benefit of his bargain and suffered a diminution in value of his vehicle.

14.   Defendant ARC Automotive, Inc. ("ARC") is incorporated in Delaware and maintains its principal place of business in Tennessee.

15.   Defendant Toyoda Gosei North America, Inc. ("Toyoda Gosei") is incorporated in Michigan and maintains its principal place of business in Michigan.

16.   Defendant General Motors, LLC is incorporated in Delaware and maintains its principal place of business in Michigan.

17.   **Personal Jurisdiction—ARC.** ARC is subject to jurisdiction before this Court because it is registered to, and does, business throughout Michigan and within this Judicial District.

18.   ARC is in the business of designing, manufacturing, distributing, selling, and supplying airbag inflators, including the Defective Inflators at issue in this action.

19.   ARC has been registered as active to conduct business in Michigan since 2000.

20. ARC conducts business with the other Defendants within this judicial district, including by selling its airbag inflators to those Defendants within Michigan.

21. ARC designs, manufactures, markets, distributes, and supplies its airbag inflators with the intent and expectation that they be sold, serviced, used, and warrantied in every state in the nation, including within Michigan.

22. **Personal Jurisdiction—Toyoda Gosei.** Toyoda Gosei is subject to this Court's general jurisdiction as it is a Michigan entity, and it is also subject to specific jurisdiction because this case arises out of defects in airbag modules Toyoda Gosei designed, manufactured, assembled, supplied, distributed, and sold in Michigan.

23. **Personal Jurisdiction—GM.** GM is subject to this Court's general jurisdiction as its principal place of business is in Michigan, and it is also subject to specific jurisdiction because this case arises out of defects in airbag modules which GM placed into 2010-2017 Chevrolet Equinox models which it then marketed, distributed, and sold throughout Michigan

24. This Court has diversity jurisdiction under the Class Action Fairness Act (28 U.S.C. § 1332(d)(2)(A)) because this case presents minimal diversity and an amount in controversy exceeding $5,000,000, exclusive of interests and costs.

25. The Defendants are located and do significant business, including with regard to the marketing, distribution, and sale of the Class Vehicles and Defective

Inflators, within this Judicial District. As such, venue is proper here pursuant to 28 U.S.C. § 1391(a)-(c).

### III.    FACTUAL ALLEGATIONS

**A.    The ARC Inflator Defect.**

26.    Airbags are safety devices intended to protect drivers and passengers during a crash.

27.    The airbag uses a cushion to prevent occupants from striking the steering wheel, dashboard, or other hard surfaces in the vehicle. The cushion deploys during an impact. The deployment is caused by an airbag inflator, which is a metal canister housing chemical propellant, and sometimes, as in the case of the ARC inflators at issue, highly compressed gas.

28.    During a crash, the propellant within the canister ignites and heats the gas, which then causes the airbag cushion to fill with air.

29.    PSAN is one of the cheapest propellant chemicals available. However, its use in an airbag propellant is highly problematic because of its volatility, which causes it to burn faster than other, more commonly used, propellant chemicals.

30.    The metal inflator canister can only sustain so much force before shattering apart. If there is any reason the pressure within the canister unexpectedly increases, such as a blocked exhaust port that does not allow the gas to increase,

PSAN's burn rate increases exponentially in response to that increase in pressure—exacerbating the danger of over-pressurization.

31.     The use of PSAN-based propellant, then, leaves no room for error in the inflator that can result in over-pressurization, which can be magnified by the PSAN. Unlike inflators manufactured by almost all other companies, the ARC inflators used PSAN as part of their propellant formulation. And ARC made additional design decisions that exacerbated, rather than mitigated, the over-pressurization danger presented by PSAN.

32.     In particular, ARC specified, as part of the inflator design, that a defective friction welding process be used to fuse two metal shells together to form the inflator canister housing. The friction welding process chosen by ARC rotates at least one of the shells as the two are forced together, causing the metal to soften so that they can be fused. The friction welding process allows for soft metal to splash outside of the weld, where it hardens.

33.     The escaped portions of softened metal are referred to as "flash." In ARC's inflators, both the outside of the canisters and the internal central tube are welded together. The flash that forms inside the central tube cannot be seen without inspections by specialized equipment. The flash is dangerous because, during deployment, it can break off the inflator and partially or fully block the exhaust port, allowing the gas to build up inside the inflator. Because of this known danger,

manufacturers are supposed to implement a friction welding process that either removes the flash after the weld is created or conducts specialized inspections to ensure no flash formed.

34.     The accelerated burn rate PSAN exhibits as pressure unexpectedly increases as a result of the obscured port causes the pressure within the canister to rise exponentially. When the force becomes too much, particularly if the port is fully blocked, the metal canister can then explode, flinging metal shrapnel through the airbag cushion and into the vehicle. As a result, the PSAN-based propellant and a faulty friction welding process are a dangerous combination that can cause deadly airbag ruptures.

35.     ARC furthered its design errors by choosing not to use alternative design features that would help to alleviate the foreseeable over-pressurization caused by using PSAN-based propellant and a faulty friction welding process.

36.     One of the ways ARC could have alleviated pressure in the system would be through the use of pressure relief valves.

37.     Pressure relief valves were a technologically and economically feasible alternative design during all relevant times, and were in fact used by one of the very few other airbag inflator suppliers who have ever used a PSAN-based propellant, TRW. TRW used pressure relief valves in the early 2000s, well before the time the Class Vehicles were placed onto the market and sold to Plaintiff and the Class.

38.    ARC's own patent applications, recall materials, and other technical documents confirm the dangers of PSAN and metal flash, as well as the efficacy of pressure-relief valves.

39.    As to the danger of PSAN, ARC acknowledged that:

a.  PSAN "undergoes certain phase changes during temperature variations causing cracks and voids if any associated binder is not sufficiently strong and flexible to hold the composition together," which ARC admitted in its 1995 patent application entitled "Eutectic Mixtures of Ammonium Nitrate and Amino Guanidine Nitrate;"

b.  PSAN "is a problem since many gas generate compositions containing this oxidizer have unacceptably low melting points and are thermally unstable," which ARC admitted in its 1998 patent application entitled "Nonazide Ammonium Nitrate Based Gas Generant Compositions that Burn at Ambient Pressure;"

c.  "With ammonium nitrate based generants becoming unacceptable for usage in automotive airbag inflator applications regardless whether they are used in pyrotechnic or hybrid type inflators, alternate or non-ammonium nitrate containing generants are highly desirable. Even in a hybrid inflator where the generant is stored in a

high-pressure inert gas atmosphere making moisture intrusion nearly impossible, ammonium nitrate based generants are still considered unacceptable," which ARC admitted in its 2018 patent application entitled "Non-Ammonium Nitrate Based Generants."

40.     A 2017 recall of certain Ford vehicles containing a particular lot of ARC inflators acknowledged the danger of metal weld flash formation within the ARC inflators, stating that "preliminary analysis indicates that weld flash from the inflator canister welding process at the Tier 2 inflator supplier [ARC] may obstruct the gas exhaust port."

41.     ARC has at least two patents for inflators that contain pressure relief valves. One of those patents, filed in 2013 and entitled "Variable Orifice Construction," describes a design allowing the size of the inflator's exit orifice to increase as gas pressure in the inflator increased.

42.     ARC's 2020 patent entitled "Airbag Inflator With Pressure Relief Valve and Increased Combustion Efficiency" describes a hybrid inflator that incorporates a series of vent holes and sub-chambers allowing for ventilation, as well as "flow diverters" to "direct and control pressure and flow." ARC further explained:

Some existing inflator assemblies utilize a center support structure that requires two simultaneous welds, which is problematic in respect of manufacturing and also increases the potential for weld particles to exit the inflator upon deployment. Existing designs have also been configured to fragment during deployment as a consequence, in the event of excessive pressure increase within the inflator due to some

failure or external condition or the like, these existing inflator designs can be potentially hazardous for vehicle occupants.

\* \* \*

It would be desirable to provide an airbag inflator that reduces gaseous effluents with efficient combustion while incorporating additional safety features in respect of venting and unintended increases in internal pressure and weld particles.

43.     In sum, the Defective Inflators suffer from a uniformly defective design that renders them dangerous because they pose a fatal risk of rupture.

**B.     Each Defendant profited from the concealment of the Inflator Defect via the sale and lease of the Defective Inflators and Class Vehicles to Plaintiff and the Class.**

44.     ARC's Defective Inflators made their way into the Class Vehicles through a supply chain that began with ARC, which is referred to as the "Tier 2" supplier, which manufactured the inflators and supplied them to Toyoda Gosei, which is referred to as the "Tier 1" supplier.

45.     Toyoda Gosei then took the Defective Inflators and placed them into an airbag module that, in turn, could be installed into a vehicle.

46.     Toyoda Gosei then supplied the airbag module to the GM Defendants, which installed the airbag modules containing the Defective Inflators in the Class Vehicles.

47.     Through this supply chain, each Defendant profited from the sale and lease of the Defective Inflators and Class Vehicles.

11

48.     As part of the supply chain, Toyoda Gosei and GM provide ARC with technical specifications and requirements that ARC's inflators must meet to ensure that the components could be assembled together and be functional within the Class Vehicles. ARC must complete multiple design and testing processes and present the results to Toyoda Gosei and GM before the inflator is approved for purchase for the vehicle model and model year. ARC, Toyoda Gosei, and GM likewise exchange information and review documents created during the design, testing, and production phases when servicing warranty claims, investigating incidents involving an alleged defect in a part or component, responding to requests for information from government investigators, responding to litigation related to the parts or components, or as otherwise required as part of their business operations.

49.     Through the exchange of information described above, each Defendant knew that the Defective Inflators contained PSAN-based propellant, used a faulty friction welding process, and did not have pressure relief valves. They likewise knew about the government investigation and rupture incidents described below.

50.     PSAN has long been known to be a dangerous and highly volatile chemical within the automotive industry, making its use in airbag inflator propellant unacceptable to most industry participants. The dangers of PSAN were highlighted in the Takata airbag recalls that ultimately formed the largest automotive recall in U.S. history, as well as litigation that included many class action, personal injury,

and wrongful death cases, some of which were consolidated into a federal multi-district litigation.

51.     Additionally, industry and academic literature have long documented the dangers of PSAN-based propellants. One example includes a 2012 report from Penn State's High Pressure Combustion Laboratory which identified and described PSAN's susceptibility to "dynamic burning"—which refers to the process in which PSAN responds exponentially to increased pressure, causing it to burn far more rapidly than expected.

52.     The Penn State researchers further determined that PSAN's dynamic burning characteristics could lead to dangerous over-pressurization.

53.     The Defendants all would have been aware of the Penn State report because of their roles as experts in the airbag industry, and also because it was prominently covered by the *New York Times* in 2014 as part of the outlet's coverage of the Takata airbag recalls.

54.     Despite knowing of the dangerous design characteristics of the Defective Inflators, each Defendant nonetheless continued to remain silent and conceal the defect so that they could make money from the sale of the Defective Inflators and the inflators' use in the Class Vehicles that were sold and leased to Plaintiff and the Class.

55.    As a result of Defendant's failure to disclose, and concealment of, the Inflator Defect, Plaintiff and the Class had no way of knowing that the Class Vehicles had a dangerous defect that could cause their airbags to rupture and expel metal shrapnel into the occupant compartment. Indeed, the Class had no way of even ascertaining whether their Class Vehicles were equipped with ARC-brand airbag inflators—let alone the particular design of and risks posed by those inflators.

**C.    ARC's inflators have ruptured in the field and in lab testing, killing and injuring people, and prompting several recalls and an ongoing NHTSA investigation.**

56.    Airbag ruptures are incredibly rare and should never happen. A single rupture is a red flag that a design change is warranted. More than one rupture is very strong evidence of a defect; and each additional rupture provides additional evidence.

57.    So far, publicly available information shows that ARC's Defective Inflators have ruptured at least nine times; seven times in the field (i.e., in vehicles that had been placed on the market) and two times during testing. But, as seen in the Takata airbag recall and litigation, the publicly reported incidents are rarely the end of the story. It is likely that more ruptures have occurred and will be uncovered in discovery through this case.

58.    The reported ruptures include the following:

a. A 2009 Ohio crash in which the ARC Defective Inflator equipped in a 2002 Chrysler Town and Country van's driver side airbag ruptured. The publicly available information does not disclose whether the driver or anyone else sustained an injury.

b. A 2014 New Mexico crash in which the ARC Defective Inflator equipped in a 2004 Kia Optima's driver side airbag ruptured and caused serious injuries to the driver. The driver filed a lawsuit, which Kia and ARC confidentially settled shortly after filing.

c. A 2016 Canada crash in which the ARC Defective Inflator equipped in a 2009 Hyundai Elantra's driver side airbag rupture and killed the driver. This incident prompted a limited recall of certain 2009 Elantra vehicles in Canada, but no corresponding recall in the U.S.

d. A 2017 Pennsylvania crash in which the ARC Defective Inflator equipped in a 2011 Chevrolet Malibu's driver side airbag ruptured, severely injuring the driver and prompting a lawsuit and a limited recall.

e. Two ARC Defective Inflators (passenger side) ruptured during testing at ARC's facilities, prompting limited recalls by BMW and Ford.

f. A 2021 Michigan crash in which the ARC Defective Inflator equipped in a 2015 Chevrolet Traverse's driver side airbag ruptured and killed a mother of ten, with four of her children in the vehicle with her. The autopsy report states that metal shrapnel was found lodged in the driver's neck. The police report likewise states that: "It appeared that the driver's side airbag malfunctioned causing it to detach from the steering column and sent metal fragments into the driver's compartment of the vehicle. The igniter for the front driver's side airbag was found on the passenger side dashboard. There was also metal shrapnel on the driver's side dash, in the instrument cluster and markings on the driver's side roof which appeared to come from the driver's side airbag."

g. A 2021 California crash in which the ARC Defective Inflator equipped in a 2016 Audi A3's passenger side airbag ruptured and caused severe lacerations to the passenger. The passenger filed a products liability action which remains pending, and Volkswagen subsequently issued a limited recall.

59. The ruptures described above occurred in inflators made during varying time frames in several factories around the world. Thus, the ruptures are occurring

16

as a result of a systemic design defect, rather than a manufacturing defect occurring at one plant in a limited time frame.

60.     NHTSA has been investigating ARC's Defective Inflators since at least as early as July 2015, when it opened Preliminary Investigation (PE15-207) into 490,000 ARC hybrid inflators. NHTSA subsequently upgraded this investigation into a more detailed Engineering Analysis (EA16-003) following the fatal 2016 Canadian rupture.

61.     NHTSA's investigation is ongoing, with no conclusions yet published and very little investigation documents made public.

62.     It appears that ARC has impeded the investigation at times as NHTSA chastised the company in an October 4, 2016, letter, stating:

> Furthermore, beyond ARC's lax response to compulsory process, ARC's attitude and approach to the Agency's investigation remains troubling. Since this investigation was opened, ARC has on more than one occasion questioned the necessity of providing certain information, failed to provide documents in a readable format, appeared nonchalant in its approach to developing a testing plan or protocol, and has advocated for the closure of the investigation without possessing or providing a full understanding of the root cause for at least one of the underlying inflator ruptures.

> Additionally, a number of incidents involving ARC's product have been brought to NHTSA's attention by vehicle manufacturers and other suppliers. These incidents range from testing failures to recalls, and raise serious questions regarding the quality and integrity of ARC's air bag inflators. While vehicle manufacturers and other suppliers have voluntarily notified NHTSA of these and other incidents without the need for a formal request, ARC has failed to take any steps to notify the Agency of these incidents, or their potential relationship to the incidents

under investigation. After the Agency learned of one of these incidents earlier this year, the Agency contacted ARC and indicated that the company needed to provide this type of information to NHTSA proactively. Instead of noting the serious nature of these incidents and committing to work with NHTSA to determine the appropriate range of issues at hand, ARC's counsel stated that they had no obligation to provide such information and chastised Agency staff for indicating otherwise.

Compounding ARC's failure to inform the Agency of these matters, ARC has also failed to comply with Standing General Order 2015-02A, issued in the underlying Preliminary Evaluation, which requires ARC to file a report within five days of receiving notification of an inflator field rupture. On July 8, 2016, a fatal rupture occurred in Newfoundland, Canada. NHTSA was notified of this incident on by both Transport Canada and by Hyundai. Although ARC was clearly notified of the incident, as demonstrated by ARC's attendance at an inspection of the vehicle that occurred on July 26, 2016, ARC has failed to provide any report to NHTSA regarding that incident. As noted by the Standing General Order, failure to comply with that obligation calls for the imposition of daily civil penalties.

ARC's response to the Agency's investigation to date does not demonstrate the behavior that NHTSA expects of manufacturers, must less manufacturers of vital safety components utilized in vehicles across the globe. To the contrary, ARC's behavior has demonstrated a lack of cognizance regarding the seriousness of this investigation and the underlying issues. ARC has been given every consideration, yet has failed to respond in kind.

63. While NHTSA's investigation remains ongoing, several limited recalls have already been issued due to ARC's Defective Inflators. The recalls have all been limited to only those vehicles that contain an inflator from the same lot as a ruptured inflator, and none of the recall notices mention the use of PSAN. Only one recall has

mentioned the friction welding flash but made it sound as if it was a limited-time occurrence. Those recalls include:

    a.  A March 2017 BMW recall of certain 2017 X5 models following a rupture occurring in ARC's facilities in March 2017.

    b.  An August 2017 Ford recall of certain 2017 F150 and Mustang models following a rupture occurring in ARC's facilities in 2017.

    c.  A January 2019 General Motors recall of certain 2010-2011 Chevrolet Malibu vehicles.

    d.  An October 2021 General Motors recall of certain 2013-2017 Chevrolet Traverse and 2008-2017 Buick Enclave models.

    e.  An April 2022 General Motors recall of certain 2015 Chevrolet Traverse, Enclave, and Acadia models.

    f.  A July 2022 Volkswagen recall of certain 2016 Audi TT, Audi TT Roadster, TT Coupe, S3 Sedan, R8 Coupe, A3 Sedan, A3 Sportback e-tron, A3 Cabriolet, Golf SportWagen, Golf R, Golf GTI, Golf Mk7, and battery-electric e-Golf hatchback models following the 2021 California rupture.

## IV.   <u>CLASS ACTION ALLEGATIONS</u>

64.     **Class Definition**: Plaintiff seeks certification of this case as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3), and/or (c)(4) of:

*All persons who purchased or leased a Class Vehicle in the State of Michigan.*

65.     The class definition excludes those individuals who allege personal injury as a result of a Class Vehicle airbag failure.

66.     **Numerosity and Ascertainability:** There are thousands of Class Vehicles, rendering the claims impracticable to bring on an individual basis. The Class members can be readily identified through vehicle registration and sales information, including those on file with public agencies as well as through Defendants' records.

67.     **Predominance:** Questions of law and fact with common answers for Plaintiff and the Class predominate over questions affecting only individual class members, including:

    a.   The existence and nature of the Inflator Defect;

    b.   Whether the Inflator Defect renders the Class Vehicles unsuitable for their intended purposes;

    c.   Whether the Inflator Defect renders the vehicles unmerchantable;

    d.   Whether Defendants owed a duty to disclose the Inflator Defect;

    e.   Whether Defendants failed to disclose the Inflator Defect;

f.  Whether Defendants knew of the Inflator Defect prior to the time the Class Vehicles were designed, manufactured, and sold;

g.  Whether Defendants issued an express warranty for the Class Vehicles, and if so, whether they breached that warranty as a result of the Inflator Defect;

h.  Whether Defendants issued an implied warranty for the Class Vehicles and, if so, whether they breached that warranty as a result of the Inflator Defect;

i.  Whether the Class Vehicles suffered a diminution in value;

j.  Whether Plaintiff and the Class suffered damages as a result of the Defendants' actions and omissions alleged in this action;

k.  Whether Defendants should be subjected to punitive or exemplary damages;

l.  Whether Defendants should be forced to remedy the Inflator Defect;

m.  Whether Plaintiff and the Class are entitled to equitable or injunctive relief;

n.  Whether the Defendants should be forced to provide notice of the Inflator Defect to all persons who purchased or leased a Class Vehicle;

o.  Whether Defendants should be forced to pay monetary damages to Plaintiff and the Class.

68.   **Typicality:** Plaintiff's claims are typical of the Class because they all arise out of the Defendants' same course of conduct and the same Inflator Defect.

69.   **Adequate Representation:** Plaintiff will adequately and fairly represent and protect the interests of the Class, and have retained counsel with substantial experience in complex civil actions and the financial resources needed to prosecute the action.

70.   **Superiority:** The class action mechanism is superior to resolve the claims of Plaintiff and the Class because, otherwise, they would be effectively denied any relief at all since it does not make economic sense to bring individual actions when comparing the costs to the potential individual awards which would be likely obtained. Moreover, prosecution of thousands and thousands of individual actions would quickly overwhelm the judicial system.

71.   **Particular Issues:** All common issues identified above are particular and common to all Class members such that resolution of each or all would materially advance the resolution of this action and serve the interests of judicial economy

72.     **Injunctive Relief:** Defendants have acted and refused to act on grounds generally applicable to the Class, making appropriate final injunctive and declaratory relief for the entire Class.

**Count I: Violation of the Michigan Consumer Protection Act**
**<u>Against all Defendants</u>**

73.     Plaintiff reincorporates allegations 1 through 72 and brings this count for Violation of the Michigan Consumer Protection Act (Mich. Comp. Laws § 445.901, *et seq.*) (the "MCPA") against all Defendants.

74.     At all relevant times, Defendants were and are engaged in "trade" and "commerce" as defined by Mich. Comp. Laws § 445.902(1)(g).

75.     Plaintiff, the Class, and Defendants are "persons" as defined by Mich. Comp. Laws § 449.902(1)(d).

76.     Defendants repeatedly and routinely violated the MCPA by failing to disclose and concealing the existence of the Inflator Defect so that they could profit from the sale, service, and use of the Defective Inflators and Class Vehicles.

77.     Defendants' course of conduct alleged in this action violated Mich. Comp. Laws §§ 445.903 because they: (i) represented that the Class Vehicles and the Defective Inflators have characteristics, uses, benefits, and qualities which they do not have; (ii) represented that the Class Vehicles and Defective Inflators are of a particular standard, quality, and grade of which they are not; and (iii) advertised

the Class Vehicles and Defective Inflators with the intent to sell and lease them in a different manner than advertised.

78.     The Defendants' actions and omissions were likely to, and in fact did, mislead ordinary reasonable consumers, including Plaintiff and the Class, with regard to the safety and performance of the Class Vehicles' airbags.

79.     Plaintiff and the Class had no means of knowing of the existence of the Inflator Defect given that they had no way of knowing how the Defective Inflators were designed and manufactured.

80.     As a result of their superior knowledge and concealment of the Inflator Defect, Defendants had a duty to disclose the defect to Plaintiff and the Class prior to the point of purchase or lease.

81.     Plaintiffs and the Class suffered economic injury as a result of paying money to purchase or lease Class Vehicles they otherwise would not have purchased or leased, or by paying more than they would have otherwise paid if they had been notified of the Inflator Defect.

82.     Defendants' actions and omissions present a continuing threat to the public given that thousands of Class Vehicles are being driven on the roadways of Michigan and the rest of the country each day, posing a fatal risk to those drivers and passengers.

83.     Plaintiff, individually and on behalf of the Class, seeks all available damages declaratory and injunctive relief to prevent Defendants from continuing their conduct which violates the MCPA, as well as attorneys' fees, costs, and all other relief available under the MCPA.

## Count II: Breach of Express Warranty Against GM

84.     Plaintiff reincorporates allegations 1 through 72 and brings this count for breach of express warranty against all Defendants.

85.     The Class Vehicles are "goods" as defined by Mich. Comp. Laws §§ 440.2105(1) and 4400.803(1)(h).

86.      At all relevant times, GM was and is a "merchant," "seller," and "lessor" of the Class Vehicles as defined by Mich. Comp. Laws §§ 440.2104(1), 440.2803(3), 440.2103(1)(c), and 440.2803(1)(p).

87.     The Class members are "buyers" and "lessees" of the Class Vehicles as defined by Mich. Comp. Laws §§ 440.2103(1)(a) and 440.2803(1)(n).

88.     GM issued an express written warranty that each Class Vehicle would be free of defects in materials and workmanship and repairs would be provided, free of charge, for any defects in materials or workmanship in the airbag.

89.     GM's express warranty was part of the basis of the bargain for Plaintiff and the Class in purchasing and leasing the Class Vehicles.

90.     GM breached its express warranty by failing to disclose or remedy the Inflator Defect in the Class Vehicles.

91.     Plaintiff and the Class suffered damages as a result of the Defendant's breach of warranty.

92.     Any opportunity to cure the breach is unnecessary and futile given that GM knew of, and concealed, the Inflator Defect prior selling and leasing the Class Vehicles.

93.     On behalf of himself and the Class, Plaintiff seeks all available damages, injunctive relief, equitable relief, attorneys' fees and costs, and all other relief available for GM's breach of warranty.

### Count III: Breach of Implied Warranty Against GM

94.     Plaintiff reincorporates allegations 1 through 72 and brings this count for breach of implied warranty against all Defendants.

95.     The Class Vehicles are "goods" as defined by Mich. Comp. Laws §§ 440.2105(1) and 4400.803(1)(h).

96.      At all relevant times, GM was and is a "merchant," "seller," and "lessor" of the Class Vehicles as defined by Mich. Comp. Laws §§ 440.2104(1), 440.2803(3), 440.2103(1)(c), and 440.2803(1)(p).

97.     The Class members are "buyers" and "lessees" of the Class Vehicles as defined by Mich. Comp. Laws §§ 440.2103(1)(a) and 440.2803(1)(n).

98.     Pursuant to Mich. Comp. Laws §§ 440.2314 and 440.2862, GM issued an implied warranty that each Class Vehicle was in merchantable condition and fit for the ordinary purpose for which it is used.

99.     GM breached the implied warranty because, at the time of sale and lease, and continuing through today, the Class Vehicles are defective, in an unmerchantable condition, would not pass without objection in the trade, and are not fit for the ordinary purpose for which they are used.

100.   Plaintiff and the Class suffered damages as a result of the Defendants' breach of warranty.

101.   Any opportunity to cure the breach is unnecessary and futile given that GM knew of, and concealed, the Inflator Defect prior to selling and leasing the Class Vehicles.

102.   On behalf of himself and the Class, Plaintiff seeks all available damages, injunctive relief, equitable relief, attorneys' fees and costs, and all other relief available for Defendant's breach of warranty.

## **REQUEST FOR RELIEF**

103.   Plaintiff, individually and on behalf of the Class, requests that the Court enter Judgment against the Defendants providing for:

   a. An order certifying the Class, with Plaintiff as the Class Representative and Plaintiff's counsel as Class Counsel;

b.  A judicial decree that Defendants violated the MCPA;

c.  A judicial decree that GM breached its express warranty for the Class Vehicles as a result of the Inflator Defect;

d.  A judicial decree that GM breached it's implied warranty for the Class Vehicles as a result of the Inflator Defect;

e.  A judicial decree that the Defendants' must disgorge all profits they obtained from their conduct which violated the MCPA;

f.  An award of all monetary damages available for Plaintiff and the Class;

g.  An award of punitive damages to deter Defendants' conduct;

h.  An award of attorneys' fees and costs; and

i.  An award of prejudgment and post judgment interest.

Dated: November 11, 2022

MARK K. WASVARY, P.C.

_/s/ Mark K. Wasvary_____
Mark K. Wasvary
MARK K. WASVARY, P.C.
645 Griswold, Ste 4300
Detroit MI  48226
Telephone: (248) 649-5667
Email:  mark@wasvarylaw.com

REINHARDT WENDORF &
BLANCHFIELD
Garrett D. Blanchfield (*pro hac vice to be submitted*)
Brant Penney (*pro hac vice to be submitted*)

Roberta Yard (*pro hac vice to be submitted)*
332 Minnesota Street, Suite W1050
Telephone: (651) 287-2100
Facsimile: (651) 287-2103
Email: g.blanchfield@rwblawfirm.com
Email: b.penney@rwblawfirm.com
Email: r.yard@rwblawfirm.com